UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

RALPH GONNOCCI REVOCABLE
LIVING TRUST,

        Plaintiff,

                            Case No. 02-74796

v.

                            Honorable Patrick J. Duggan

THREE M TOOL & MACHINE, INC.,
ULTRA GRIP INT'L, INC., THREE M
HOLDING CORP., ULTRA GRIP NORTH,
INC., and MICHAEL A. MEDWID,

        Defendants.
_____/

## **OPINION**

At a session of said Court, held in the U.S.
District Courthouse, Eastern District
of Michigan, on March 28, 2006.

PRESENT:   THE HONORABLE PATRICK J. DUGGAN
U.S. DISTRICT COURT JUDGE

On December 4, 2002, the Ralph Gonnocci Revocable Living Trust ("Trust") filed

this lawsuit alleging that Defendants are infringing U.S. Patent No. 5,184,833 (the '833

Patent).  The '833 Patent encompasses the design of a power chuck, a device mounted on

a machine tool in order to hold a work piece in place.  According to the first amended

complaint, the Trust is the owner of the '833 Patent.  *See* First Am. Compl. ¶ 2.

Defendants are Three M Tool & Machine, Inc., Ultra Grip International, Inc., Three M

1

Holding Corporation, Ultra Grip North, Inc., and Michael A. Medwid (collectively "Defendants").  Defendant Michael A. Medwid ("Medwid") is an officer and the majority owner of the defendant corporations.  Presently before the Court are the following motions:[1]

> 1)  Defendants' motion for summary judgment of Count I pursuant to the equitable doctrines of laches, estoppel, and unclean hands (Docket #101);
>
> 2)  Defendants' motion for summary judgment of Count I under 35 U.S.C. § 102(b) or, in the alternative, under the doctrine of patent shop rights (Docket #102);
>
> 3)  Trust's motion for summary judgment (Docket #103);
>
> 4)  Defendants' motion for summary judgment under 35 U.S.C. § 112 (Docket #104);
>
> 5)  Defendants' motion for partial dismissal pursuant to Federal Rule of Civil Procedure 12(b)(6) and for partial summary judgment pursuant to Rule 56(b) as to The Trust's claim for willful patent infringement (Docket #105); and
>
> 6)  Defendants' motion for partial summary judgment of The Trust's claims for inducing infringement under 35 U.S.C. § 271(b) and contributory infringement under 35 U.S.C. § 271(c) as to all Defendants (Docket #106).

The motions have been fully briefed and the Court does not believe that a hearing or oral argument is necessary.  Defendants also filed a motion for summary judgment regarding the Trust's claim for damages prior to April 12, 1999 (Docket #107), which they

---

[1]For ease of reference, the Court will cite to the motions and the responses thereto by their docket numbers.

2

subsequently withdrew.

## I.      Standards for Rule 12(b)(6) Dismissal and Summary Judgment

A motion to dismiss pursuant to Rule 12(b)(6) tests the sufficiency of a complaint. Construing the complaint in a light most favorable to the plaintiff and assuming that the plaintiff's factual allegations are true, the court must determine whether the complaint states a valid claim for relief. *Mayer v. Mylod*, 988 F.2d 635, 638 (6th Cir. 1993)(citing *Jenkins v. McKeithen*, 395 U.S. 411, 421-33, 89 S. Ct. 1843, 1848-49 (1969)). A court may dismiss a claim pursuant to 12(b)(6) motion "only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegation." *Hishon v. King & Spalding*, 467 U.S. 69, 73, 104 S. Ct. 2229, 2232 (1984)(citing *Conley v. Gibson*, 355 U.S. 41, 45-46, 78 S. Ct. 99, 102 (1957)).

Summary judgment is appropriate only when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. *See* FED. R. CIV. P. 56(c). The central inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52, 106 S. Ct. 2505, 2512 (1986). After adequate time for discovery and upon motion, Rule 56(c) mandates summary judgment against a party who fails to establish the existence of an element essential to that party's case and on which that party bears the burden of proof at trial. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 2552 (1986).

The movant has an initial burden of showing "the absence of a genuine issue of

3

material fact." *Id.* at 323. Once the movant meets this burden, the non-movant must come forward with specific facts showing that there is a genuine issue for trial. *See Matsushita Electric Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S. Ct. 1348, 1356 (1986). To demonstrate a genuine issue, the non-movant must present sufficient evidence upon which a jury could reasonably find for the non-movant; a "scintilla of evidence" is insufficient. *See Liberty Lobby*, 477 U.S. at 252, 106 S. Ct. at 2512.

The court must accept as true the non-movant's evidence and draw "all justifiable inferences" in the non-movant's favor. *See id.* at 255. The inquiry is whether the evidence presented is such that a jury applying the relevant evidentiary standard could "reasonably find for either the plaintiff or the defendant." *See id.*

## II. Factual and Procedural Background

Ralph Gonnnocci ("Gonnocci") and Kenneth Cross ("Cross") began working on the design for the power chuck encompassed in the '833 Patent in early 1990. In mid-1990, Defendant Michael Medwid approached Cross about the formation of a new company to develop, manufacture, and sell power chuck products. Cross informed Medwid that he had some design ideas for a new power chuck product. In late 1990, Medwid and Cross began discussing the joint venture with Gonnocci.

In September 1990, Medwid hired Gonnocci as an employee of 3M. In late December 1990, the new venture contemplated by Medwid, Cross, and Gonnocci was incorporated as Ultra Grip, Inc. ("Ultra Grip"). Cross was named President and Gonnocci was named Vice President of the new company. Thereafter, Cross and Gonnocci

4

finalized the design for their power chuck invention and a prototype was manufactured.

On January 12, 1992, the patent application for Cross' and Gonnocci's power chuck invention was filed with the United States Patent and Trademark Office ("PTO"). On the application for the '833 Patent, Cross and Gonnocci were listed as the inventors. The patent application was filed with an "Assignment by Joint Inventors" wherein Cross and Gonnocci assigned their rights to the '833 Patent to Ultra Grip.

During the negotiations between Medwid, Cross, and Gonnocci with respect to the formation of Ultra Grip, Medwid promised Cross and Gonnocci that they would become part-owners of Ultra Grip once the company began generating a profit. Medwid maintained, however, that the company never became profitable. Gonnocci and Cross believed that Ultra Grip failed to become profitable due to Medwid's improper accounting methods. As a result of this dispute, Cross left Ultra Grip in 1993. Gonnocci, however, remained with the company for another seven years.

Sometime in the late 1990's, Medwid discovered that Cross– as President of Ultra Grip– had executed and recorded an assignment of the '833 Patent to himself and Gonnocci on July 7, 1992. Medwid further discovered that on October 8, 1993, Cross assigned his rights in the patent to Gonnocci and that on April 12, 1999, Gonnocci assigned his rights to the Trust. Cross had passed away in 1994.

In the meantime, in late 1993, the entire business of Ultra Grip was merged into 3M. In 1997, a new company called Ultra Grip International, Inc. ("Ultra Grip International") was formed as a subsidiary of 3M. At that time, Gonnocci became an

5

employee of Ultra Grip International, where he continued to work until his termination in mid-2000.  Prior to his termination, 3M approached Gonnocci and requested that he sign over the rights to the '833 Patent to the company; Gonnocci refused.

In June 2000, an attorney representing Gonnocci sent a letter to Medwid requesting that 3M cease and desist infringement of the '833 Patent and informing Medwid that Gonnocci intended to enforce his rights in the patent.  Between June and September 2000, Gonnocci and Defendants attempted to negotiate a settlement regarding the '833 Patent.  On December 18, 2000, by which time it was clear that a settlement could not be reached, 3M and Ultra Grip International filed a lawsuit against Gonnocci and the Trust in the Circuit Court for the County of Oakland, State of Michigan ("state court lawsuit").  *See* Docket #103 Ex. I.

In the state court lawsuit, 3M and Ultra Grip International alleged that Gonnocci was employed by 3M and Ultra Grip when he developed and/or refined the power chuck invention embodied in the '833 Patent and that he used the resources of 3M and Ultra Grip during the course of part or all of his design and refinement of the invention.  *See id*. ¶¶ 14-15.  3M and Ultra Grip International further alleged that other employees of 3M and Ultra Grip contributed to the invention.  *See id*. ¶ 16.  3M and Ultra Grip International claimed that the understanding of the parties was that the power chuck concept and design would be provided to Ultra Grip for its exclusive use, to the exclusion of other manufacturers, and that Cross' and Gonnocci's interest in any patent obtained in connection with the power chuck would be assigned to 3M and its affiliates.  *See id*. ¶ 18.

6

3M and Ultra Grip International claimed that Cross' and Gonnocci's reassignment of the patent rights to themselves in July 1992 violated their common law and statutory fiduciary duties to the 3M affiliates, constituted unlawful conversion, breached an express or implied contract between the parties, and constituted silent fraud.

On April 17, 2002, 3M and Ultra Grip International asked the state court to dismiss their claims without prejudice. The state court denied their request. Thereafter, 3M's and Ultra Grip International's attorneys filed a request to withdraw, which the state court granted on June 19, 2002. The court ordered the plaintiffs to retain new counsel within 21 days and scheduled a status conference for July 23, 2002. 3M and Ultra Grip International failed to obtain new counsel by the court's deadline and failed to appear at the status conference. Gonnocci and the Trust subsequently asked the state court to dismiss the case with prejudice. The state court granted the request and dismissed the case with prejudice on August 9, 2002. *See* Docket #114 Ex. 4.

On December 4, 2002, the Trust filed the instant lawsuit. This Court subsequently stayed the proceedings pending the outcome of a request for re-examination of the '833 Patent before the PTO. The stay was lifted following the PTO's determination that the re-examined claims of the '833 Patent are patentable. The Trust then filed an amended complaint and, on January 20, 2006, filed a second amended complaint alleging one count of patent infringement in violation of 35 U.S.C. §§ 271(a)-(c). The Trust claims that Defendants directly infringed the '833 Patent and actively induced and contributed to the infringement by others through the manufacture, use, and sale of the accused devices.

Defendants raise a number of defenses to the Trust's infringement claim.

Defendants assert *inter alia* that the '833 Patent is invalid, that they have "shops right" to

the '833 Patent, and that the Trust's claims are barred by laches, estoppel, and unclean

hands.  Defendants also filed a counter-complaint in which they allege the following

counts: (1) a request for a declaratory judgment; (2) unfair competition; (3) unjust

enrichment; (4) common law trademark infringement; and (5) common law unfair

competition.  As to count one of their counter-complaint, Defendants seek a declaratory

judgment that, due to their affirmative defenses, they have not infringed, contributed to

the infringement of or, or induced the infringement of the '833 Patent.

### III.    Defendants' Motion for Summary Judgment Under 35 U.S.C. § 112 [Docket #104]

In this motion, Defendants ask the Court to declare the '833 Patent invalid for

failure to disclose the "best mode" of the putative invention pursuant to 35 U.S.C. § 112.

Section 112 describes the requirements of a patent specification.  As relevant to this

motion, this section provides:

> The specification shall contain a written description of the
> invention and of the manner and process of making and using
> it, in such full, clear, concise, and exact terms as to enable any
> person skilled in the art to which it pertains, or with which it
> is most nearly connected, to make and use the same, and shall
> set forth *the best mode* contemplated by the inventor of
> carrying out his invention.

35 U.S.C. § 112 (emphasis added).  Defendants argue that the '833 Patent fails to satisfy

the best mode requirement because it does not include the following statement contained

8

in drawings of the invention previously prepared by Cross and Gonnocci that were distributed to contemplated third party customers: "Keep chuck filled with Standard Oil Co. Amdex No. 1 Extreme Pressure Greaser or Equivalent."

The purpose of the best mode requirement is to "preclude[] inventors 'from applying for patents while at the same time concealing from the public preferred embodiments of their inventions which they have in fact conceived." *High Concrete Structures, Inc. v. New Enter. Stone and Lime Co.*, 377 F.3d 1379, 1383 (Fed. Cir. 2004)(quoting *In re Gay*, 309 F.2d 769, 772 (1962)). "The specification must set forth the best mode known to the inventor for practice of the invention *claimed* in the patent." *Id.* at 1382 (citing 35 U.S.C. § 112) (emphasis added). In other words, the requirement does not apply to parts of the invention that are not claimed. *Spalding & Evenflo Co. v. Acushnet Co.*, 718 F. Supp. 1023, 1049 (D. Mass. 1989)(holding that where the invention claimed is for an improved cover for golf balls– which according to the patent are comprised of a core and a cover– the specification need not include the best method of making the core). The requirement also does not apply to information that would be readily known to persons in the field of the invention– i.e. persons skilled in the art. *High Concrete Structures*, 377 F.3d at 1383.

Invalidation for failure to set forth the best mode requires proof that (1) the inventor knew of a better mode than was disclosed and (2) the inventor concealed that better mode. *Id.* at 1382 (citation omitted). The critical time for determining whether the inventor knew of a better mode is when the patent application was filed. *Mentor H/S, Inc.*

9

*v. Med. Device Alliance, Inc.*, 244 F.3d 1365, 1375 (Fed. Cir. 2001)(citing *Nobelpharma AB v. Implant Innovations, Inc.*, 141 F.3d 1059, 1064 (Fed. Cir. 1998)).  Defendants have the burden of establishing by clear and convincing evidence facts supporting the conclusion that the '833 Patent is invalid.  *Id.*

The Court concludes that Defendants' motion for summary judgment seeking invalidity of the '833 Patent based on Section 112 should be denied for several reasons. First, the claimed invention is a power chuck which is comprised of a body, a plurality of work engaging jaws, a plurality of rocking arms, a plurality of swivel mountings, a plurality of slide members, and a reciprocable actuator.  *See id.* Ex. A. (U.S. Patent No. 5,184,833) col.1 *l.*21-40 (filed January 2, 1992).  Defendants fail to demonstrate that the use of a particular type of oil is part of the claimed invention or necessary for carrying out the claimed invention.  Second, Cross and Gonnocci did not conceal this alleged better mode for carrying out their invention, as this information was included in drawings that Ultra Grip presented to potential customers when it first attempted to sell the power chuck.  Finally, Defendants fail to establish clear and convincing evidence that Cross and Gonnocci believed that the best mode of their invention, at the time the patent application was filed, required the use of a particular type of oil.  At most Defendants show that "[o]ver a year prior to the filing date of the patent application for the power chuck" Cross and Gonnocci created drawings that included a statement recommending the use of a particular oil.  *See* Docket #104 at 4.

**IV.    Defendants' Motion for Summary Judgment of Count I under 35 U.S.C. §**

10

**102(b) or, in the Alternative, Under the Doctrine of Patent Shop Rights [Docket #102] and the Trust's Motion for Summary Judgment Regarding Defendants' Defenses of Shop Rights Doctrine, Laches, and Estoppel [Docket #103]**

In their motion, Defendants argue that the '833 Patent is invalid due to "prior use." Alternatively, Defendants contend that the Trust's patent infringement claim should be dismissed pursuant to the "shop rights" doctrine. The Trust has filed a motion for summary judgment, claiming *inter alia* that Defendants are barred from raising their shop rights defense pursuant to the doctrine of res judicata and, alternatively, that their defense fails.[2]

**A.    Prior Use**

35 U.S.C. § 102(b) provides:

> A person shall be entitled to a patent unless–
>
> . . .
>
> (b) the invention was patented or described in a printed publication in this or a foreign country *or in public use* or on sale in this country, more than one year prior to the date of the application for patent in the United States . . .

35 U.S.C. § 102(b) (emphasis added). " 'Public use' includes 'any use of the invention by a person other than the inventor who is under no limitation, restriction or obligation of secrecy to the inventor.'" *Netscape Commc'ns Corp. v. Konrad*, 63 U.S.P.Q.2d 1580,

---

[2]The Trust's request for summary judgment with respect to Defendants' other equitable defenses, as well as Defendants' motion for summary judgment based on those particular defenses [Docket #101], will not be addressed in this section.

1583 (Fed. Cir. 2002)(quoting *Petrolite Corp. v. Baker Hughes, Inc.*, 96 F.3d 1423, 1425 (Fed. Cir. 1996)).  As the Federal Circuit described its purpose: "'The public use bar serves the policies of the patent system, for it encourages prompt filing of patent applications after inventions have been completed and publicly used, and sets an outer limit to the term of exclusivity.'"  *Id*. (quoting *Allied Colloids v. Am. Cyanamid Co.*, 64 F.3d 1570, 1574 (Fed. Cir. 1995)).

Defendants contend that the '833 Patent is invalid under Section 102(b) because, more than one year before the application for the '833 Patent was filed, Cross and Gonnocci discussed the power chuck invention with Medwid and showed Medwid drawings of their invention.  *See* Docket #102 at 7-8.  Defendants assert in their motion that these communications between Cross, Gonnocci, and Medwid and Cross' and Gonnocci's dissemination of the drawings of their invention "w[ere] not subject to any type of confidentiality or secrecy agreement," *see id*. at 3, and  that "no restrictions or secrecy was placed over the dissemination of any drawing, disclosure or other material." *See id*. at 8; *see also id*. at 9-10 & 11.  Relying on *Netscape Communications*, Defendants argue that this use constituted "public use."

While Defendants argue in their motion and brief that there was no confidentiality obligation imposed on Medwid, they do not cite to any evidence to support this assertion. In fact notably absent from Medwid's lengthy declaration– which includes several paragraphs describing his preliminary discussions with Cross and Gonnocci and the drawings Cross and Gonnocci showed him– is any assertion by Medwid that he did not

12

believe that there was a confidentiality requirement.  In comparison, the Trust presents evidence to show that the discussions about Cross' and Gonnocci's invention and their drawings of the invention were regarded as confidential.  At his deposition, Gonnocci testified that he "absolutely" considered the discussions with Medwid to be confidential and that the confidentiality of the venture specifically was discussed at a meeting with Medwid.  *See* Docket #116 Ex. 5 at 95-96.

The Court therefore cannot find a public use of the invention embodied in the '833 Patent one year prior to the filing of the patent application.  Defendants' motion for summary judgment based on invalidity due to prior use must be denied.  For the reasons discussed below, however, the Court concludes that Defendants are entitled to summary judgment based on their shop right defense.

**B.    Res Judicata**

The Trust argues that, pursuant to the doctrine of res judicata, the state court's dismissal with prejudice of 3M's and Ultra Grip International's lawsuit against Gonnocci and the Trust bars Defendants from raising their shop rights defense and their other equitable defenses. Res judicata bars a party from relitigating a claim that is based upon the same transactions or events that gave rise to a prior lawsuit.  In determining whether the judgment of a state court has a preclusive effect on a subsequent action or issues brought in federal court, the Full Faith and Credit Act, 28 U.S.C. Section 1873, requires the district court give the same preclusive effect to the prior state court judgment as it would have under the law of the state whose court issued the judgment. *Migra v. Warren*

13

*City Sch. Dist. Bd. Educ.*, 465 U.S. 75, 81, 104 S. Ct. 892, 896 (1984); *Smith, Hinchman and Grylls, Assoc. v. Tassic*, 990 F.2d 256, 257 (6th Cir. 1993); *see also* U.S. CONST. ART. IV, § 1.

Under Michigan law, the doctrine of res judicata bars a subsequent action when (1) the prior action was decided on the merits; (2) the issues raised in the second case either were resolved in the first case, or through the exercise of reasonable diligence might have been raised and resolved in the first case; and (3) both actions involve the same parties or their privies. *Pierson Sand & Gravel, Inc. v. Keeler Brass Co.*, 460 Mich 372, 379, 596 N.W.2d 153 (1999); *Smith, Hinchman and Grylls, Assoc., Inc. v. Tassic*, 990 F.2d 256, 257-58 (6th Cir. 1993). 3M's and Ultra Grip International's state court action was decided on the merits. *See* MCR 2.506(B)(3). Both actions involve the same parties or their privies. Defendants argue, however, that res judicata does not apply because the state court lacked subject matter jurisdiction over Defendants' equitable claims because exclusive jurisdiction over patent claims falls within the federal courts. While Defendants' equitable claims involve a patent, this Court does not agree with Defendants that those claims therefore fall within the exclusive jurisdiction of the federal courts.

While jurisdiction over claims "arising under" the patent laws is exclusively vested in the federal courts, 28 U.S.C. § 1338(a), "not all claims involving patent laws 'arise under' the patent law." *MGA, Inc. v. LaSalle Mach. Tool, Inc.*, 148 Mich. App. 350, 353, 384 N.W.2d 159, 160 (1986)(citing *A & C Eng'g Co. v. Alherholt*, 355 Mich. 677, 95 N.W.2d 871 (1959)). As the Michigan Supreme Court summarized the extent of a state

14

court's jurisdiction in the patent field in *A & C Engineering*:

> "The key to the correct rule is the distinction between a 'case' arising under the patent laws and a 'question' arising under those laws . . . "Reduced to its lowest terms, the correct rule is that if the plaintiff founds his suit directly on a breach of some right created by the patent laws, he makes a case arising under those laws and only a Federal court has jurisdiction; but if he founds his suit on some right vested in him by the common law, or by general equity jurisprudence, he makes a case arising under state law and only a state court has jurisdiction . . ."

355 Mich. at 681, 95 N.W.2d at 873 (internal citations omitted). *A & C Engineering* is particularly instructive because the plaintiff corporation claimed in that case– as Defendants do here– that it was entitled to a "shop right" in the defendant former employee's invention. *Id.* at 685, 95 N.W.2d at 875. As the Michigan Supreme Court explained, the corporation's claim "appears to be a common law [e]quity action to determine ownership of a patent and involves the federal patent laws only obliquely and incidentally." *Id.* at 682, 95 N.W.2d at 873.

In this case, the state court action was not based on a breach of some right created by patent laws; rather, Ultra Grip and 3M claimed a violation of statutory rights and common law duties. *See infra* at 7. This Court therefore does not agree with Defendants that res judicata is inapplicable because the state court lacked subject matter jurisdiction to address 3M's and Ultra Grip International's shop rights argument. The Court believes, however, that res judicata does not bar Defendants' shop right defense for a different reason.

15

Res judicata bars claims that were raised or that should have been raised in the prior proceeding. *See supra* at 14. Defendants' shop rights defense, however, is a defense not a claim. *See, e.g.,* 8 DONALD S. CHISUM, CHISUM ON PATENTS, § 22.03[3] (2005) (explaining that "[t]he shop right is not an ownership interest in the patent. Rather it constitutes a defense to a charge of patent infringement by the employee or his/her assignee.") As Defendants point out, because the Trust did not file a counter-claim for infringement in the state court, 3M and Ultra Grip had no reason to raise shop rights as a defense in that proceeding. Thus the Court concludes that res judicata does not apply.[3]

## C.      The Shop Rights Doctrine

As a general rule, an individual owns the patent rights to the subject matter of which he or she is an inventor despite the fact that the invention may have been conceived or reduced to practice during the course of his or her employment. *Banks v. Unisys Corp.*, 228 F.3d 1357, 1359 (Fed. Cir. 2000). In *Banks*, the Federal Circuit identified two

---

[3]While Defendants' shop rights defense and other equitable defenses are based on similar factual allegations as 3M's and Ultra Grip's claims in the state lawsuit, Defendants are not barred from "relitigating" those factual issues pursuant to the doctrine of collateral estoppel. Under Michigan law, collateral estoppel or issue preclusion bars relitigation of issues of fact or law that were "actually litigated" and "necessarily determined." *Markowitz v. Campbell*, 190 F.3d 455, 461-62 (6th Cir. 1999)(citing *People v. Gates*, 434 Mich. 146, 452 N.W.2d 627, 630 (1990)). To be "actually litigated," an issue must be "determined by the trier of fact;" to be "necessarily determined," the issue must be "essential to the judgment." *Id*. at 462 (citations omitted). There is no indication in the record that the facts and legal claims in 3M's and Ultra Grip International's state court complaint were actually litigated or necessarily determined, as the state court dismissed their lawsuit because they failed to obtain new counsel and appear at a status conference. It does not appear that the state court ever reached the merits of the plaintiffs' claims.

exceptions to this rule: "[F]irst an employer owns an employee's invention if the employee is a party to an express contract to that effect; second, where an employee is hired to invent something or solve a particular problem, the property of the invention related to this effort may belong to the employer." *Id*. at 1359.  Both exceptions are premised on contract law principles; the second exception on an implied-in-fact contract to assign the patent rights to the employer.  This second exception is sometimes referred to as the "employed to invent exception." *Id*.  State and federal courts also have identified another exception based on an implied-in-fact contract which arises where the employer has contributed to the development of the invention.  *McElmurry v. Arkansas Power & Light Co.*, 995 F.2d 1576, 1581-82 (Fed. Cir. 1993); *A & C Eng'g Co.*, 355 Mich. at 686, 95 N.W.2d at 875 (citing *Detroit Testing Lab. v. Robison*, 221 Mich. 442, 191 N.W. 218 (1922)).  This exception is commonly referred to as "shop rights."[4]

The Federal Circuit has described an implied-in-fact contract as "an agreement 'founded upon a meeting of the minds, which, although not embodied in an express contract, is inferred, as a fact from the conduct of the parties showing, in the light of the surrounding circumstances, their tacit understanding.'" *Teets*, 83 F.3d at 408 (quoting *Baltimore & Ohio R.R. v. United States*, 261 U.S. 592, 597, 43 S. Ct. 425, 426 (1923)).  Courts "should look to such factors as the circumstances surrounding the development of

_____

[4]Some courts also use the term "shop rights" to refer to the exception which arises where the employer specifically hires or directs the employee to invent something or solve a particular problem.  *See, e.g., Teets v. Chromalloy Gas Turbine Corp.*, 83 F.3d 403, 407 (Fed. Cir. 1996).

17

the patented invention and the inventor's activities respecting that invention, once developed . . ." *McElmurry*, 995 F.2d at 1580.  Under Michigan law, the question of whether there is an implied-in-fact contract is to be resolved through the consideration of all the circumstances.  *In re Lewis Estate*, 168 Mich. App. 70, 75, 423 N.W.2d 600, 603 (1988).

Defendants rely on the following facts to support their shop rights argument.  First, that Cross, Gonnocci, and Medwid agreed to create a new business venture for the purpose of manufacturing, marketing, and selling power chucks, including the power chuck invention on which Cross and Gonnocci were then working.  *See* Docket #100 ¶ 3. In September 1990, before Ultra Grip was incorporated, 3M employed Gonnocci and he and Cross worked together at 3M's facility in Walled Lake, Michigan.  *See id.* ¶ 4-6. According to Medwid, Gonnocci's job responsibilities included designing and selling power chucks and other workholding equipment.  *See id.* ¶ 5. Through the Fall of 1990, Cross and Gonnocci presented Medwid with several drawings of their power chuck design on Ultra Grip blueprints.  *See id.* & Ex. 2-4.  These drawings were kept in the records at the Walled Lake facility.  *See id.* ¶ 8.

On December 27, 1990, Medwid instructed his business attorney to formally incorporate Ultra Grip.  *See id.* ¶ 11.  Medwid or 3M paid the costs and expenses to form and incorporate Ultra Grip.  *See id.*  Cross and Gonnocci were named President and Vice-President of Ultra Grip, respectively.  *See id.*  Gonnocci continued to be employed by 3M for some time after Ultra Grip's incorporation, but eventually was placed on Ultra Grip's

18

payroll sometime in 1991.  *See id.* ¶ 13.  When Ultra Grip was formed, it was Medwid's understanding that he would provide the funding, financing, and facilities available through 3M for the new company and Cross and Gonnocci, in exchange, would contribute their designs and product ideas.  *See id.* ¶ 11.

After Ultra Grip was incorporated, the power chuck invention embodied in the '833 Patent evolved into a finished product and Ultra Grip offered it for sale to Ford Motor Company.  *See id.* ¶ 15.  On January 2, 1992, the patent application for the '833 Patent was filed.  Ultra Grip issued the checks to the law firm that filed the patent application.  *See id.* ¶ 17 & Ex. 12. The patent application included an assignment wherein Cross and Gonnocci assigned their patent rights to Ultra Grip.  *See id.* ¶ 18 & Ex. 13.  Thereafter Gonnocci continued to work for Ultra Grip.  Gonnocci's employment continued beyond December 1993 (when Ultra Grip merged back into 3M) and after Ultra Grip International was created as a division of 3M.  Throughout this period, Ultra Grip, 3M, or Ultra Grip International manufactured and sold the power chuck embodied in the '833 Patent.[5]  Gonnocci specifically testified that during his employment he never objected to Defendants' manufacture and/or sale of the products covered by the '833 Patent and he in fact admits that he acquiesced in Defendants' activities.  *See* Docket #114 Ex. 6 at 59-62; Docket #103 at 3.

---

[5]Medwid maintains that neither Three M Holding Corporation, Ultra Grip North, Inc., nor Medwid individually use or sell any product involving the power chuck design shown in the '833 Patent.  *See* Docket #100 ¶ 2.  The Trust presents no evidence to demonstrate otherwise.

19

These facts and circumstances surrounding the development of the power chuck invention and Defendants' activities respecting that invention suggest that Medwid, Cross, and Gonnocci agreed that Ultra Grip would be assigned the rights to the '833 Patent.[6]  Gonnocci acknowledges that this was his intent.  *See* Docket #114 Ex. 6 at 58-62. These facts and circumstances also indicate that Defendants specifically employed Gonnocci to invent a power chuck for Ultra Grip to manufacture and sell.  In fact an article in Crane's Detroit business at the time of Ultra Grip's incorporation, provides additional facts about the business relationship between Medwid, Gonnocci, and Cross to support an implied-in-fact contract under the "employed to invent" rule.  *See* Docket #100 Ex. 11. As the article explains, Cross and Gonnocci formerly worked for N.A. Woodworth Co., a power chuck producer; Cross as the company's President and Gonnocci as a design engineer.  *See id.*  Cross and Gonnocci left Woodworth after it was purchased by another company.  *See id.*  Prior to that time, 3M manufactured a substantial portion of Woodworth's power chucks.  *See id.* After Woodworth was sold, Medwid contacted Cross to discuss a business relationship and the parties eventually agreed to form Ultra Grip.  *See id.*  As the article explains, "Medwid agreed to fund start-up costs, and Cross and Gonnocci agreed to design and market a new line of chucks."  *See id.*

The Trust presents few facts to counter Defendants' version of the facts and circumstances surrounding the development of Cross' and Gonnocci's power chuck

---

[6]As indicated *infra*, Cross and Gonnocci in fact did assign their rights to the '833 Patent.

invention or 3M's and Ultra Grip's contributions to the invention. The Trust contends that Cross and Gonnocci completed the basic design for the invention embodied in the '833 Patent before Gonnocci began his employment with 3M. *See* Docket #103 Ex. B at 50. But even Gonnocci acknowledges that it only was after Ultra Grip was created that the design for the power chuck was finalized and the first prototype was built. *See id.* & Docket #116 Ex. 5 at 74. The Trust also contends that Cross and not Ultra Grip paid for the patent application; however in light of the remaining facts and circumstances, this fact would not convince the Court that a shop right did not arise.

The Trust argues, however, that if any shop right existed, it existed only in Ultra Grip which undisputedly no longer exists. As indicated above, however, Gonnocci initially worked for 3M before Ultra Grip was created, he continued to work for 3M after Ultra Grip merged back into it, and he eventually worked for Ultra Grip International when it was formed as a subsidiary to 3M. Moreover, as the Sixth Circuit has recognized, shop rights have been held to pass by merger to the resultant corporation. *PPG Indus., Inc. v. Guardian Indus. Corp.*, 597 F.2d 1090, 1094 (6th Cir. 1979)(citations omitted); *see also Lane & Bodley Co. v. Locke*, 150 U.S. 193, 14 S. Ct. 78 (1893); 8 DONALD S. CHISUM, CHISUM ON PATENTS, §22.03[3][c] (2005)(cases cited therein). The Supreme Court's decision in *Lane & Bodley*, which remains good law, is particularly instructive.

In *Lane & Bodley*, the plaintiff inventor was hired as a designing engineer and draftsman at an engine and machinery manufacturer called Lane & Bodley. 150 U.S. at 197, 14 S. Ct. at 79. During his employment, the plaintiff developed and refined a stop

21

valve to be used in elevators. *Id*. The invention was subsequently patented, produced, and used by Lane & Bodley for a number of years with the plaintiff's knowledge and without his objection. *Id*. at 197-98, 14 S. Ct. at 79. The Supreme Court concluded that these facts raised an indefeasible implied license in favor of the employer. *Id*. at 200, 14 S. Ct. at 80. The Court further concluded that the implied license extended to the successor of Lane & Bodley, as that company "was organized upon the same basis as the firm; that the business of the company was to be the same as that carried on by Lane & Bodley, and to be carried on the same premises; that the entire property and assets of the firm and its liabilities and obligations were devolved upon the company." *Id*. at 196, 14 S. Ct. at 79.

The Court therefore concludes that Defendants hold a shop right in the '833 Patent and that they are entitled to summary judgment with respect to the Trust's infringement claim. Based on this conclusion, the Court sees no reason to address the validity of Defendants' remaining equitable defenses or Defendants' motions for partial summary judgment as to the Trust's claim for willful infringement and claim for inducing infringement and contributory infringement.

## V.    Conclusion

In summary, the Court holds that Defendants are not entitled to summary judgment based on invalidity. The Court concludes, however, that Defendants have demonstrated an absence of a genuine issue of material fact with respect to their shop rights defense. As Defendants maintain a shop right in the '833 Patent, the Court holds that they are

22

entitled to summary judgment with respect to the Trust's infringement claim.  Based on

this holding, the Court will deny the Trust's motion for summary judgment and deny as

moot Defendants' remaining motions for summary judgment.

An Order consistent with this Opinion shall issue.

s/PATRICK J. DUGGAN
UNITED STATES DISTRICT JUDGE

Copies to:
Rodger D. Young, Esq.
Daniel H. Bliss, Esq.
Jeffrey P. Thennisch, Esq.
Leonard K. Berman, Esq.